UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN PENDLETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV1455 HEA |
| | ) | |
| QUIKTRIP CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPNION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No. 60]. Plaintiff opposes the motion. For the reasons set forth below, the Motion is granted.

Plaintiff brought this action under the provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq*. (ERISA). Plaintiff's Complaint alleges that Defendant violated Section 510 of ERISA, 29 U.S.C. § 1140,[1] which makes it unlawful, *inter alia*, for an employer to discharge a

---

[1] Section 1140 provides, in relevant part:

It shall be unlawful for any person to discharge, fine, suspend, expel discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

participant in an ERISA plan for the purpose of interfering with the participant's ERISA rights under the plan.

## **Facts and Background**

Plaintiff began working for Defendant in August, 1989. Plaintiff continued to work for Defendant for almost 15 years. During his employment, Plaintiff held numerous positions. The last position he held was Director of Real Estate. As Director of Real Estate, Plaintiff was responsible for all QuikTrip real estate acquisition and store development within the geographic area encompassed by the St. Louis Division, which included Missouri, Iowa and Nebraska. Plaintiff managed a staff of five or six. Plaintiff had no negative reports from supervisors during his employment with Defendant, nor did Plaintiff have any sense that anyone at QuikTrip had been attempting to cause him to leave the company.

In June, 2004, Plaintiff announced his intention to leave Defendant's employ, but did not, at that time, have a specific departure date other than October, 2004. Plaintiff had decided to pursue another career in private real estate development and had made informal arrangements to join a real estate development group in St. Louis. This group was not a competitor of Defendant. Defendant asked Plaintiff if he would stay until at least December 31, 2004 in order to assist in the transition of his job duties to his successor. Plaintiff agreed.

On July 23, 2004, Plaintiff learned that Rodney Loyd from the operations group at corporate headquarters would replace him as Real Estate Director. Plaintiff conducted his regular Friday staff meeting later that same day. Plaintiff made certain statements at this meeting. Lance Schmidt, an employee present at this meeting, reported Plaintiff as having made statements to the effect that Plaintiff didn't know what was going on with the company; that his replacement may know about selling "Twinkies," but probably had never even seen a real estate contract except for the one to buy his house; that the company promotes people into positions where they do not know what they are doing.

Plaintiff's boss, Jeff Thoene, believed that Plaintiff's statements would jeopardize Defendant's ability to transition Plaintiff's job responsibilities to Loyd. Thoene went to his supervisor, Jaime Marchesano. Thoene repeated Schmidt's account of what had happened at the meeting and recommended that Defendant fire Plaintiff. Marchesano agreed that if Plaintiff had made the statements attributed to him, he should be fired. Marchesano went to the president of Defendant, Chet Cadieux, to inform Cadieux of his decision to fire Plaintiff. Cadieux agreed with Marchesano's decision.

On July 27, 2004, the day they learned of Plaintiff's statements, Thoene and Marchesano traveled to St. Louis to meet with Plaintiff. They told him what had

been reported to them. Plaintiff did not deny that he had made the statements attributed to him by Schmidt. Plaintiff made no statements in response to what Thoene and Marchesano reported to Plaintiff. Plaintiff testified that he was not allowed to explain what occurred in the staff meeting or what the other participants had said, or to provide any context of statements attributed to him. He also testified that he was not given the option to explain or apologize for his statements, nor the option of offering to refrain from making such statements in the future. Plaintiff was told by Marchesano that he was being terminated for cause, and he asked Plaintiff if he understood what that meant, to which Plaintiff responded that he thought that he did. Thoene handed Plaintiff some documents, including a dismissal notice, which he asked Plaintiff to sign. Plaintiff refused to sign the dismissal notice. The Notice of Dismissal included a section entitled "Details." The "Details" section provided:

> [Plaintiff] gave notice to terminate his employment with QuikTrip on June 25th, 2004. On July 23, 2004 [Plaintiff's] replacement was announced to the management group of the store development department. They were asked to communicate this personnel change to their employees so that most of the store development group would be aware of this change prior to the announcement going out to the rest of the company via e-mail. [Plaintiff] communicated the change to his employees in St. Louis and made it very clear to his workgroup that he disagreed with the decision. He made statements similar to "That's what's wrong with this f...ing company, they promote operations people into positions where they don't know what they're doing." He also made a statement similar to "The company is developing a bunch of in-breeds." He also made a statement about his replacement similar

to "Rodney may be good at buying Twinkies but he's probably never seen a real estate contract other than the one he used to buy his home."

> This [sic] actions in this discussion with his employees were insubordinate and completely unacceptable. If [Plaintiff] disagreed with the decisions being made by others within the management group there is a process set up that will allow him to express his views from his direct supervisor to the president of the company.

At the time of Plaintiff's discharge, Defendant maintained certain employee benefit plans governed by ERISA. Particularly, Defendant maintained a severance pay policy and plan dated April 30, 2004. This plan provided, in pertinent part,:

> The primary purpose of severance pay is to accommodate position elimination/lay offs. Although these have historically been rare at QuikTrip, severance pay is meant to temporarily assist employees while finding other employment. Severance pay based on tenure with QuikTrip may under certain circumstances also be provided to full-time employees who are physically unable to perform their duties, meet the Rule of 75, or upon death. Severance may also be applicable for employee initiated position downgrades (see policy 6-01-010 Position Downgrading). Employees terminated for cause will not receive severance, regardless of status or years of services.
>
> All severance pay must have written approval by the Director, Human Resources.
>
> Severance pay is based on full years of full-time service and is not prorated for any partial service year.
>
> Part-time months and/or years of service are not used in calculating severance.
>
> This policy is not intended to be a retirement plan.

The Policy sets forth the implementation of the Plan as follows:

Hourly employees and Levels 1 through 7 Staff Specialist/Mid-Management employees who are approved for severance will receive one week of regular pay (excluding bonus) for each year of full-time service.

Store Managers and Levels 8 and 9 Staff Specialist/Mid-Management employees approved for severance will receive 1.5 weeks of severance at their current weekly pay for each year of full-time service.

Severance packages for Levels 10 through 17 Staff Specialist/Mid-Management, Directors, and Vice Presidents will be negotiated. An employee in this category separating employment for any of the reasons listed above must notify the Director/Human Resources for completion of a separation package. The Director/Human Resources will negotiate the terms of the severance package.

Prior to April 30, 2004, all full-time employees who terminated employment, except those leaving because of gross misconduct, received severance benefits. A Memorandum explaining the change in severance benefits was distributed to Defendant's employees. This memorandum from President Cadieux contained the following explanation of benefits:

> I am writing to you to explain a change that will take effect April 30, 2004 with QuikTrip's severance policy. This is a significant change and reduction in benefits that is being driven by a couple of things.
>
> First, the accounting rules for severance plans would cause QuickTrip to recognize an additional accrual of $2.5 million dollars in the new fiscal year. We're required to accrue for every employee, whether they qualify for severance or not.

Secondly, the true purpose of severance plans is to provide temporary assistance to those employees whose job is eliminated. It is not meant to pay severance to an employee who quits or is terminated, who then goes to work for the competition. That's not good use of company funds. QuikTrip wants to provide assistance for all employees who are laid off, disabled and can no longer work in the stores, those who satisfy the Rule of 75[2], or in the event of an employee's death we want to assist their family.

That's how the new severance policy is designed. It will go in effect April 30, 2004. There will be a 30-day grace period should you choose to leave QuikTrip before June 1, 2004 you may still collect under the old policy. If you have any questions contact your Personnel Manager or the Director, Human Resources immediately.

It is never easy to reduce a benefit to employees, but this benefit is truly designed for situations involving lay-offs or death. If you stay with QuikTrip until you qualify, you'll still have the same benefits. It was a business decision to correct the severance policy to reflect these intentions.

Defendant also maintained the QuikTrip Corporation Class B Common Stock Purchase Plan, under which Plaintiff during the course of his employment was issued stock that was subject to redemption by Defendant following termination of Plaintiff's employment.

The Stock Plan provided, in relevant part,:

In the event that the relationship between the Participant and the

---

[2] Defendant's "Rule of 75" is defined in a footnote of the Plan as "A combination of years of service plus age. For example, employees must have a minimum of 20 years of service with QuikTrip and be at least 50 years of age (22+53=75)"

> Company is terminated, either voluntarily or involuntarily, for any reason other than for retirement (as defined in Paragraph Five (b) hereof) after the Participant has become the owner of shares of stock (a "Terminated Employee"), the Company shall have the irrevocable options, exercisable within one hundred eighty (180) days after the date of the payment of the final cash severance benefit by the payment of cash, to purchase the shares of stock of the Company owned by the Participant at its book value of the stock as of the end of the last month preceding the date of the payment of the final cash severance benefit for which a financial statement was prepared by the Company.

Plaintiff was offered eight weeks of severance benefits in August, 2004. Plaintiff refused to take this payment. On October 15, 2004, Plaintiff received his profit bonus and breakeven bonus. He had previously received cash payments for his vacation pay, (July 30, 2004), his final salary payment, (July 30, 2004), reimbursement for his executive medical payment, (August 13, 2004), and interest payments on his Class A stock, (August 12, 2004).

Plaintiff's Complaint alleges in two counts that Defendant's actions violated ERISA. Plaintiff contends that Defendant discharged him for reasons that were pretextual and calculated to mask a motivating factor in the company's action in terminating him, which was to interfere with benefits to which Plaintiff was entitled under the Severance Plan, (Count I), and the Stock Option Plan, (Count II), constituted bad faith and a breach of its fiduciary duty.

Defendant moves for summary judgment on both Counts. Defendant argues it

is entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure in that there exists no genuine issues as to any material fact.

## Standards of Review

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Littrell ,* 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life*

*Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005). Summary Judgment will be granted when, viewing the evidence in the light most

favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-7(8th Cir. 2007).

## **Discussion**

Section 510 of ERISA makes it unlawful for an employer to discharge a participant in an employee benefit plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 871-876 (8th Cir. 2008). To establish a claim for a violation of § 510, Plaintiff must show Defendant "had a specific intent to interfere with [his right to] benefits, but that may be shown by circumstantial evidence." *Id,* (quoting *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136-37 (8th Cir. 2005)). In the absence of direct evidence of an employer's deliberate interference with future benefits, the Court analyzes § 510 interference claims using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-04 (1973) three-part burden-shifting analysis common to

Title VII and ADEA cases. *Fitzgerald*, 521 F.3d at 871-76. See also *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1035 n. 7 (8th Cir.2007) (holding because "[Plaintiff's] ERISA claim is based on alleged circumstantial evidence ... we analyze [it] under the McDonnell Douglas framework.").

Although Plaintiff intricately analyzes every aspect leading to his discharge in an effort to establish genuine issues of material fact as to Defendant's motivation for terminating his employment, the glaring fact ignored by Plaintiff's argument is that he had not overcome, much less addressed, the single insurmountable hurdle in this matter. Plaintiff has not, and cannot, establish that he was indeed entitled to receive severance under any circumstance, whether he voluntarily left Defendant's employ in June, 2004, in December, 2004 or was terminated in July, 2004.

The severance plan unambiguously identifies those employees entitled to receive severance under the April, 2004 Plan:

> The *primary purpose of severance pay is to accommodate position elimination/lay offs*. Although these have historically been rare at QuikTrip, severance pay is meant to temporarily assist employees while finding other employment. *Severance pay based on tenure with QuikTrip may under certain circumstances also be provided to full-time employees who are physically unable to perform their duties, meet the Rule of 75, or upon death*. Severance may also be applicable for employee initiated position downgrades (see policy 6-01-010 Position Downgrading). (Emphasis added).

The Policy, while initially setting forth the company's primary purpose of granting its employees severance pay, goes on to specifically set out the other bases upon which severance pay may be provided. Severance pay will be given to: employees who are laid off. It *may* also be provided to: employees who are physically unable to perform their duties; those who meet the company's Rule of 75, and those employees who die. Finally, employees possibly eligible for severance are those in the "employee initiated position downgrade" category.

Likewise, the implementation of severance pay clearly reaffirms the limits on those eligible. The delineation of severance for each level of employees specifically provides that the employee must be approved for severance. Moreover, with respect to the higher level employees, the category into which Plaintiff would be classified, the policy once again reiterates that the employee must satisfy the conditions precedent to qualifying for severance:

> Severance packages for Levels 10 through 17 Staff Specialist/Mid-Management, Directors, and Vice Presidents will be negotiated. An employee in this category *separating employment for any of the reasons listed above* must notify the Director/Human Resources for completion of a separation package. The Director/Human Resources will negotiate the terms of the severance package. . . (Emphasis added).

Plaintiff was not eligible for any severance benefits under the April, 2004 Plan. The requirement that the separating employee must fall within one of the

listed categories, even if a high level employee, remains present in this section. While the amount of severance is to be negotiated with respect to these employees, these employees must still meet the qualifying criteria as is specifically stated in this section. Clearly, Plaintiff was not laid off from his employment, which would entitle him to severance under the Plan's primary purpose. More significantly, there is no dispute that Plaintiff was not physically unable to perform his duties, did not meet the Rule of 75, nor is he dead, the criteria which may have enabled him to seek and possibly receive severance in accordance with the Plan's provisional severance.

Plaintiff consistently urges that his termination was motivated by Defendant's improper reason to avoid paying him severance and affording him the maximum payment for his stock under the buy back provisions of the stock plan. Such argument is neither relevant nor outcome determinative in that he was ineligible for any severance. As the Eighth Circuit Court of Appeals has recognized, such an argument has no bearing on eligibility.

> [Plaintiff] claims at various points in his brief that the decision to terminate him was arbitrary and capricious or otherwise unreasonable. We pause to note that we are not charged with evaluating the wisdom of the particular employment action. See *Hudson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995). ERISA, through its protection of certain benefits, is not a mechanism through which general claims of wrongful termination can be brought. Whether the decision to terminate [Plaintiff] was arbitrary and capricious is irrelevant to whether [Plaintiff] was entitled to benefits under the Plan.

> The ability to claim benefits is set by the plan's terms and, here, [Plaintiff] was simply not entitled to benefits because the trial court found his termination, however unfair or unwise, was for violating company policy.

*Coons v. Events Pharmaceuticals, Inc.,* 367 F.3d 768, 776 -777 (8th Cir. 2004). Likewise, Plaintiff's argument regarding Defendant's motivation in terminating his employment fails for the simple reason that Plaintiff was not, under the terms of the plan, entitled to severance, whether he voluntarily left Defendant's employ or was terminated. Had Plaintiff not be terminated by Defendant in July, 2004, he still would not have been eligible for severance when his voluntary resignation took effect in December, 2004.

No ambiguity exists as to the terms and meaning of the Severance Policy and Plaintiff's implication to the contrary is woefully nonpersuasive. While Plaintiff would urge this Court to find that exchange of emails between the Vice President of Human Resources, Kim Owen, and Dave Cisiewski, one of the four directors of real estate employed by Defendant at the time, created an ambiguity justifying payment of severance to Plaintiff, the Court is unpersuaded that such emails could, even if the Court found them to be ambiguous, amend the terms of Defendant's severance policy. It is this Court's conclusion that the emails cannot create a vested right to severance benefits because they would be an impermissible, informal amendment to

the written documents of the Severance Plan. It is well-settled that informal statements by an employer's representatives about benefits do not legally alter an ERISA plan, which is required by statute to be written. *Jenson v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994). "ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise." *Palmisano v. Allina Health Systems, Inc.*, 190 F.3d 881, 885 (8th Cir.1999) (quoting *Houghton v. SIPCO*, 38 F.3d 953, 958 (8th Cir.1994)). *Barker v. Ceridian Corp.*, 193 F.3d 976, 982 (8th Cir.1999), cert. denied, 529 U.S. 1109 (2000). In this case, there is nothing ambiguous about the language establishing severance benefits under Defendant's severance plan upon which Plaintiff could seize to try to make the email exchange a "contemporaneous interpretation of the instrument by the employer" that would be "relevant evidence as to the settler's intent." *Compare id*. Thus, the email exchange, even if this caused any misinterpretation of severance benefits under Defendant's plan, changes nothing about those benefits or the way in which severance benefits are paid. Furthermore, Plaintiff's argument is further diluted by the existence of Cadieux's Memorandum explaining the new policy and clearly detailing the reasons for severance and those that are eligible. Any subsequent confusion by Plaintiff on the email exchange between Owen and Cisiewski is simply not well founded.

With respect to the Stock Plan, none of Defendant's actions violate ERISA as

an interference with benefits to which Plaintiff is entitled. Because Plaintiff had not completed twenty years of employment at the announcement of his resignation, Plaintiff was not entitled to retain his Class B stock, but rather, under the Stock Option plan, Defendant had the "irrevocable options, exercisable within one hundred eighty (180) days after the date of the payment of the final cash severance benefit by the payment of cash, to purchase the shares of stock of the Company owned by [Plaintiff] at its book value of the stock as of the end of the last month preceding the date of the payment of the final cash severance benefit for which a financial statement was prepared by the Company." Plaintiff's argument that because he has not received any severance, the "buy back" provision has not been triggered is at best wishful thinking. Defendant offered Plaintiff severance; he refused to accept it. The Court agrees with Defendant that Plaintiff cannot thwart this offer and thereafter rely on his nonacceptance to postpone the repurchase of the stock.

> One who hinders performance by the other party may not avail himself of the nonperformance which he induced or occasioned. See 17A C.J.S. Contracts s 468, p. 645, wherein it is stated: "* * * and, where he prevents, hinders, or renders impossible, the fulfillment of a condition precedent or its performance by the adverse party, or is himself the cause of failure to perform the condition, he cannot rely on such condition to defeat his liability."

*Hillis v. Blanchard,* 433 S.W.2d 276, 279 (Mo. 1968).[3] Because the last payment received by Plaintiff occurred on October 15, 2004, the 180 day period would begin to run on that date.[4]

Even were Plaintiff able to establish he was in some way entitled to receive severance benefits or to keep his stock beyond the 180 day period, Defendant would still be entitled to summary judgment under the *McDonnell Douglas* analysis. Initially, Plaintiff must make a *prima facie* showing Defendant terminated him with the specific intent of interfering with his benefits. Then the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the termination. If the employer does so, the burden shifts back to the employee to prove the proffered

---

[3] Plaintiff's apparent reliance on this Court's previous ruling on the Motion to Dismiss as support for the proposition that because he was never paid any severance, the 180 days did not yet begin to run is misplaced. As the Court pointed out in the Order denying the Motion to Dismiss, in analyzing whether a Complaint states a cause of action under the provisions of Rule 12(b)(6), the Court confines its analysis to the Complaint itself to determine whether the Complaint contains sufficient allegations to put the defendants on notice of cognizable claims against them. The Court's ruling was not a finding of fact or of law, rather, the Court merely determined that under Rule 12(b)(6) and Rule (8), Plaintiff had sufficiently *pled* a cause of action. Indeed, the Court specifically pointed out that the recitation of facts was not a determination of the truth of those facts, rather it was for the sole purpose of determining whether Plaintiff had stated a cause of action.

[4] The Court finds it reasonable to conclude that in the event severance *per se* is not paid, under the terms of the Stock Option Plan, the date of the last payment for which an employee is entitled would trigger the 180 day period.

reason was pretextual. *Fitzgerald*, 521 F.3d at 871. While Plaintiff could establish his *prima facie* case through circumstantial evidence, based on the evidence in the record before the Court, Plaintiff cannot establish that the reasons Defendant gave for Plaintiff's termination were a pretext to avoid paying him severance. Defendant's reasons for terminating Plaintiff were consistent with Plaintiff's actions and were consistently given as the reason for his termination. *Id*, at 873. There is no evidence of similarly situated employees being treated differently from Plaintiff. While Plaintiff argues that it can be "inferred" that Thoene and Marchesano's sworn testimony is not credible, Plaintiff presents no evidence to question their credibility. Indeed, the record shows that Defendant was interested in keeping Plaintiff in its employ prior to his statements and was willing to develop a severance package for him prior to his statements. But for Plaintiff's actions, the Court is of the opinion that Defendant would have indeed provided severance to Plaintiff in spite of the lack of entitlement thereto. There is absolutely no evidence from which a reasonable trier of fact could conclude that Defendant's proffered reason for discharge was a pretext for interfering with Plaintiff's benefits under either the Severance Plan or the Stock Option Plan. *Id*, at 521 F.3d 871-76.

## Conclusion

Based upon the foregoing analysis, Defendant's Motion is well taken.

Plaintiff has failed to establish the existence of genuine issues of material fact sufficient to overcome Defendant's Motion.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 60], is **GRANTED**.

**IT IS FURTHER ORDERED** that judgment will be entered in favor of Defendant and against Plaintiff.

A separate judgment in accordance with the Opinion is entered this same date.

Dated this 19th day of May, 2008.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE